THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CLARENCE CROOKS, Plaintiff in Error.

*Opinion filed June 22, 1927.*

1. CRIMINAL LAW—*as a general rule, judgment cannot be vacated after sentence and commitment.* As a general rule, in criminal cases the court has no power to vacate its judgment after a defendant has been sentenced and has been committed to the custody of the proper officer of the penitentiary, as the defendant has then begun serving the sentence and the court has lost jurisdiction of his person and of the cause.

2. SAME—*judgment may be vacated on motion under section 89 of Practice act—plea of guilty.* The rule that the court cannot vacate its judgment after sentence and commitment does not apply where there is any error in fact that may be corrected at common law by the writ of error *coram nobis* or upon motion in writing under section 89 of the Practice act, and a motion to withdraw a plea of guilty under which the defendant was sentenced, supported by affidavits purporting to show errors in fact, may be regarded as a motion under section 89 and may be heard after the defendant has been imprisoned and is serving his sentence, or in vacation after the term has been adjourned; and the court may, upon a proper writ, have the defendant brought into court for such hearing, if necessary.

3. SAME—*defendant may waive evidence under plea of guilty—minor.* While, under section 4 of division 13 of the Criminal Code, the court, if requested, is required to hear evidence under a plea of guilty, such evidence may be waived by the parties and is waived when not requested; and the fact that the defendant is a minor does not preclude him from making any waiver that might have been made in the case of an adult.

4. SAME—*guardian ad litem not necessary for minor defendant.* It is not the practice, and courts are not required, to appoint a guardian *ad litem* for an infant defendant charged with crime, and it is sufficient where an attorney is appointed to represent such a defendant who pleads guilty.

5. SAME—*what are grounds for setting aside conviction on motion under section 89 of Practice act.* A writ of error *coram nobis* or motion under section 89 of the Practice act lies to set aside a conviction obtained by duress or fraud, or where by some excusable mistake or ignorance of the accused, and without negligence on his part, he has been deprived of a defense which he could have

used at his trial and which if known to the court would have prevented a conviction, or where the conviction is based on a plea forced by fear of mob law or by other fear induced by misconduct of the officers of the court or other officers of the law in whose custody the defendant was when the confession was obtained.

6. SAME—*burden is on defendant seeking to set aside conviction by motion under section 89 of Practice act.* The proceedings in a criminal case to set aside a conviction by motion under section 89 of the Practice act are civil in their nature, and the burden is upon the accused to prove his allegations by a preponderance of the evidence.

7. PRACTICE—*what errors may be availed of by motion under section 89 of Practice act.* Errors of fact which may be availed of on writ of error *coram nobis* or on a motion under section 89 of the Practice act include excusable mistake, duress, or such fraud on the part of the opposing party or his counsel as prevents one from making his defense.

8. SAME—*how issues are made up under motion under section 89 of the Practice act—burden of proof.* A writ of error *coram nobis* or motion under section 89 of the Practice act is regarded as a declaration, the sufficiency of which must be raised by demurrer, plea of *nullo est erratum,* by motion to dismiss, by pleading special matter in confession and avoidance or by making issue of fact, which is usually done by counter-affidavits denying the facts set up in the motion and affidavits in support thereof, in which case the burden is on the party making the motion to prove the facts alleged by a preponderance of the evidence.

WRIT OF ERROR to the Circuit Court of Warren county; the Hon. GEORGE C. HILLYER, Judge, presiding.

F. O. PARRISH, CHARLES E. LAUDER, and FREDERICK H. LAUDER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, HENRY D. LEWIS, State's Attorney, and ROYCE A. KIDDER, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Clarence Crooks, (hereinafter called defendant,) was indicted by the grand jury of Warren county on March 25, 1926, for the crime of murder, and on

the same day entered a plea of guilty to the indictment and was sentenced by the circuit court of said county on said plea to imprisonment in the penitentiary at Joliet for a term of fifteen years. On the same day that sentence was imposed on the defendant the circuit court adjourned until April 3, 1926. On March 29, 1926, the defendant was taken by the sheriff of said county to the penitentiary on a *mittimus* issued in the cause. On April 2, 1926, his attorneys filed his motion for an order of court vacating the judgment of conviction and sentence and for leave to withdraw his plea of guilty and to enter a plea of not guilty. The defendant filed affidavits of himself and others in support of his motion. The State's attorney appeared and resisted the consideration of the motion on the ground that the sentence of the court had been executed by taking the defendant to the penitentiary and that the court was without jurisdiction to consider the motion for that reason, and for the further reason that the defendant was not in court. The court entered an order denying the defendant's motion. This writ of error is sued out to review the record.

The record discloses that on the day the defendant entered his plea of guilty he was furnished with a copy of the indictment, a list of the State's witnesses and was formally arraigned previous to the entry of his plea. The court explained to the defendant and admonished him of the effect and consequences of his plea and advised him of all his rights under the law, but he persisted in his plea of guilty. The court then appointed L. E. Murphy, a competent attorney of the Warren county bar, to advise and counsel with the defendant. There is in the record an affidavit of Murphy to the effect that he had been engaged in the practice of law for nineteen years, and that on being appointed as the defendant's attorney, at the request of the presiding judge he retired with the defendant to another room and there explained to him that he had a right to a trial by jury; that the next term of court would convene

in May, and that if he was unable to procure counsel the court would appoint counsel for him; that he had a right to hear the witnesses testify against him and have his lawyer cross-examine them, and that he could withhold his plea of guilty until the May term of court and have an opportunity to think the matter over and to interview his parents, who he said lived in Keokuk, Iowa. Murphy further stated under oath that this interview with the defendant covered the time of about thirty minutes, and that the defendant still persisted that he wanted to plead guilty, and that when he returned into court he still persisted in his plea of guilty before the court, and the record so shows. Thereupon three witnesses, A. D. Irey, Ray Nevius and Mamie Young, were sworn as witnesses for the State.

Only one of the witnesses, Mamie Young, was examined by the State's attorney and cross-examined by Murphy, defendant's counsel. She testified, in substance, as follows: She first met Clarence Crooks, the defendant, on March 15, 1926. He was with Bruce Collins, whom she had known about a year. They were young colored fellows who came in a Ford touring car to her home in Monmouth, in Warren county, and remained there an hour or more on that day. She and the two colored fellows then went to Galesburg, Illinois, in the Ford car driven by Collins and stayed there an hour or more. They all returned from Galesburg and went to a colored man's place in Monmouth, who is known in the record as Smith Graves, alias Bud Graves. They parked their car across an alley on the east side of Graves' house. They knocked on his door, and he unlocked it and invited them in. They entered his place and asked him if he had any liquor, and he said yes, and the defendant told him he wanted a pint and paid Graves two dollars for it. They were seated in Graves' front room the greater portion of the time they were there and drank the pint of liquor, and Collins and the defendant at intervals played a few pieces of music on a piano in the parlor, which was south

of the main room they first entered.  The defendant and
Collins got into a dispute finally, and Collins struck the de-
fendant, knocking him against a stove that was in the main
room.  The defendant then drew a knife on Collins, which
Collins took away from him.  The defendant had a gun or
revolver and undertook to draw that on Collins, but Col-
lins also took the gun away from him, remarking that a
knife and a gun were not nice things to play with.  He then
pointed the gun toward the defendant and asked him if he
liked it.  The defendant laughed, threw up his hands and
said he had to like it.  Collins then gave the defendant his
knife and gun and told him to put them away.  The defend-
ant then took the gun by the barrel, and, assuming an at-
titude of striking Collins with it, asked Collins if he liked
it.  Collins told him that was all right, and then the de-
fendant put the gun in his pocket.  She had seen the de-
fendant with this gun on their way to Galesburg, and so
far as the evidence shows the defendant was the only one
of the four persons in Graves' place who had a gun on
that afternoon, and said four persons were all who were
in Graves' place on that afternoon.  The witness did not
make it clear what the cause of the quarrel was between the
defendant and Collins.  It does appear from her evidence
that Collins had been keeping company with her since the
time he had known her.  Collins had called her into a bed-
room on the north side of Graves' main room and told her
she had been paying more attention to the defendant than
she had to him and said to her that he did not think she
had been doing him exactly right in doing so.  Collins also
told the defendant that he would never bring him to Mon-
mouth again, and that he could go with him to any other
place but he would never bring him to Monmouth any
more.  She further testified when they first went to Graves'
place she kissed the defendant once or twice and Collins
seemed to be peeved about it.  After the trouble was over
between Collins and the defendant, the defendant told

Graves that he wanted a half-pint of liquor, and Graves
sold it to him. The defendant then offered Collins a drink,
but Collins refused to drink with him. The witness then
asked the defendant for a drink, and he told her that she
could not drink with him out of his bottle, and she said to
him that was all right. Graves told her to go into the
kitchen and get her a drink, which she started to do. The
defendant then said to her that she might as well drink
with him, and offered her a glass of whiskey and told her
to drink it. She told him she did not want it, but he kept
advancing towards her trying to get her to drink it, and
finally set the bottle and the glass on the table. During
this time Collins was wanting to leave the place, saying
that he had to be in Burlington, Iowa, so that he could go
to work at eight o'clock that evening. The defendant told
Collins that it did not matter to him whether he went or
not, and Collins told him he was going to leave and he
could go back any way that he could go. Collins then asked
the witness if she was ready to go, and she told him that
she would be ready to go as soon as she could get another
drink. Collins then picked up her coat and was standing,
holding it. During this conversation the defendant was
prancing back and forth over the room with his hat on
and his thumbs in his vest, acting like a drunken person.
Graves then asked Collins when he would be back again,
and Collins replied he didn't know that he would ever be
back. The witness then spoke up and said, "Oh yes, you
will be back again." Graves then said, "Yes, don't make
this your last time; the next time you come there might
be some live ones." These were the last words spoken.
The witness then heard shooting and looked at the de-
fendant, who fired in quick succession two shots towards
Graves, who was standing near the defendant. After the
second shot Graves ran into the bed-room, exclaiming, "Oh,
my Lord!" The defendant then advanced toward the door
of the bed-room, and pointing his gun in that direction

continued to fire his revolver and fired at least four shots in all. He then turned to the witness, saying that there was one shot more left and that it could be for her. She did not know at this time where Collins was or where he went. The defendant left the room just after thus accosting her and after he had ceased firing at Graves. She then put on her galoshes and her coat and went into the bedroom where Graves was and saw him on his knees by the bed, groaning. She then left the place for her home and arrived there between 5:30 and 5:45 in the afternoon. She further stated that she, the defendant and Collins entered Graves' place about 4:10 o'clock that afternoon. The record further shows that Graves died as a result of his wounds from the pistol shots, and was found dead in his place of business by the police officers of Monmouth on the next day after he was shot. The defendant informed the trial judge that he was nineteen years old. The court found that his age was nineteen years and sentenced him as aforesaid.

The People resisted the motion of the defendant to withdraw his plea of guilty and for leave to enter a plea of not guilty upon the legal grounds already stated. In criminal cases the general rule that a court may vacate its judgment during the term applies only while the judgment remains unexecuted. The court has no power to vacate its judgment after a defendant has been sentenced and has been committed to the custody of the proper officer of the penitentiary, as the defendant has then entered upon the execution of the sentence and the court has lost jurisdiction of his person and of the cause. (*People* v. *Turney,* 273 Ill. 546; *People* v. *Perlmutter,* 306 id. 495.) This rule, however, does not apply where there is any error in fact that may be corrected at common law by the writ of error *coram nobis* or upon motion in writing made at any time within five years after the rendition of final judgment, as provided by section 89 of the Practice act.

The defendant contends that the said motion ought to have been sustained on three legal grounds, the first being that under section 4 of division 13 of the Criminal Code, in all cases where there is a plea of guilty and the court possesses any discretion as to the extent of the punishment, it shall be the duty of the court to examine witnesses as to the aggravation and mitigation of the offense. In the case of *People* v. *Pennington,* 267 Ill. 45, this court held that it is necessary for the court to make such examination when requested or desired by either the People or the defendant. This court further held in that case that the privilege given by the statute is one that might be waived by the parties and some other method of supplying the court with the necessary information be substituted. The privilege was waived in this case both by the defendant and the State, as neither of them asked nor desired any other witness to be examined. The court upon its own motion ascertained all further facts that appeared necessary for it to know, by information given it both by the State's attorney and by the attorney for the defendant. The fact that the defendant is a minor does not preclude him from making any waiver that might have been made in the case of an adult. *Bartley* v. *People,* 156 Ill. 234; *People* v. *Fisher,* 303 id. 430.

The second contention of the defendant is that the court erred in entering judgment upon the plea of guilty and imposing sentence upon the defendant without the appointment of a guardian *ad litem* to defend for him. The court did all that was required under our practice and under the law of this State by appointing an attorney to defend the defendant. It is not the practice, and courts are not required in this State, to appoint a guardian *ad litem* for an infant defendant charged with crime. *Cutter* v. *People,* 184 Ill. 395.

The third contention of the defendant, that the sentence was excessive and that the facts and circumstances in evi-

dence show the crime to be manslaughter and not murder, cannot be sustained. The crime was clearly that of murder. So far as the evidence reveals, the defendant had no cause or motive for killing Graves except the fact that Mamie Young was insisting that she would not drink with him and had determined to do as Graves requested her to do,—go into the kitchen and get a drink there. Her testimony showed that the defendant was not so intoxicated that he could not talk plainly or use himself as he willed, and that he comprehended fully all that was being said to him and done to him, none of which furnished any ground for the claim that his crime was not murder and that the penalty was excessive.

It is also the contention of the defendant's counsel that the defendant's motion for leave to withdraw the plea of not guilty, etc., and the affidavits offered in support thereof, should be regarded as a motion in writing, made under section 89 of the Practice act, for the purpose of correcting errors in fact, and that errors in fact, within the meaning of that section, were committed in this case. The People filed counter-affidavits in denial of the facts set up in the affidavits of the defendant in support of the motion, and these affidavits furnished the only defense sought to be made by the People against the defendant's motion as a motion to correct errors of fact.

In the affidavit of the defendant filed in support of his motion he states that he is innocent of the murder of Graves and that he would not have pleaded guilty if he had been allowed to exercise his own free will in making his defense; that threats of bodily injury were made to him by the officers and the party who had him in custody previous to his indictment and plea of guilty; that he made such plea under stress of fear and terror of what might happen to him if he did not make such plea; that he had decided to make a defense to the charge in the indictment and did not decide to discharge the lawyer who had been

retained by his friends to defend him until told by the offi-
cers in charge of him that his lawyer was a Ku Kluxer
and was liable to get him hanged; that he made his plea of
guilty under such threats and fear only after promises were
made to him that the penalty would be lighter than if he
made a defense, and if he made a defense the State's at-
torney would ask for the extreme penalty and he might be
hanged.   He further stated in the affidavit that on March
15, 1926, he was employed at Reilly's restaurant, in Bur-
lington, Iowa, and on that day, with Bruce Collins, drove
in a Ford automobile to Monmouth, to the home of Mamie
Young; that from there he and Collins and Mamie went
to Galesburg in the Ford car, and from there they drove
back to Graves' place, in Monmouth, arriving there about
4:30 o'clock in the afternoon, and that he had never before
that day seen either Mamie or Graves.   He further stated
that at Graves' place he purchased a pint, and then later a
half-pint, of liquor, and that the three of them drank the
liquor, and that he and Collins and Mamie remained at
that place until about 5:30 in the afternoon of that day, at
which time the shooting occurred.   He also stated that dur-
ing the time they were drinking liquor there he took his
gun out of his pocket and handed it to Collins, who played
with it a few minutes and then handed it back after hav-
ing taken the ammunition out of it.   Mamie then said,
"What is the use of having a gun unless it is loaded?"   She
persuaded affiant to put the shells back in the gun and to
give it to her.   She carried the loaded gun around with her
in the room and refused to give it to him when he asked
her for it.   While the three of them were preparing to
go home, and while affiant was putting on his overcoat, he
heard a shot and heard someone say, "Oh, my God! This
woman has shot me!"   He then saw Mamie with a gun in
her hand discharging it rapidly in the direction of Graves,
who was staggering and slowly sinking to the floor in
the bed-room.   Collins ran out through the bed-room after

the first shot. Affiant jumped toward Mamie, grabbed her wrist with one hand, twisted the gun out of her hand with his other hand, and then ran through the back door and got into the car with Collins and started for Burlington. Affiant then makes these statements: "Before he went he or Collins said, 'I wonder what she did it for.' Collins drove, starting from Monmouth about 5:30, having thrown the gun away, and before throwing the gun away he opened it and found five shells had been fired."

In this affidavit there is no express denial by the affiant of Mamie Young's statement that there had been a quarrel between him and Collins and a "gun play" and a "knife play," as she stated in her testimony. There is no express denial of her statement that just before the shooting took place Graves had invited her to take a drink of his liquor and at the same time affiant was insisting that she drink with him. There is no statement anywhere in the affidavit that shows any cause for Mamie Young having or feeling any resentment or ill-feeling toward Graves. The defendant simply gave his statement as to the shooting of Graves in the manner substantially as above set forth. The affidavit of the defendant is very lengthy. It is further set forth therein that the defendant and Collins were arrested in Burlington on Wednesday, March 17, after the shooting, and were brought to Monmouth by the officers some time that afternoon. The substance of his statement as to what occurred thereafter is, that the State's attorney, and several other of the city officers who had him in charge continually after they had separated him and Collins, continued to ply him with questions as to the shooting and as to his part therein, and that such questioning continued all that afternoon and that night until after midnight and during all the next day and the next night, which was Thursday, March 18, 1926. He specifically states that no threats or violence or misconduct of any kind toward him was indulged in by the officers and that he did not get afraid of the officers until

they began using threats, abuse and violence toward him on Thursday night, and that up to that time he had denied that he did the shooting and told the officers that Mamie Young did it, and explained to them how the killing occurred. He further stated that after they began abusing him and threatening him he changed his story and told them that he was the one who killed Graves. They continued to abuse him and to ply him with questions and to threaten him from then up to March 25, 1926, the day he plead guilty, and that he would sometimes return to his original story that he was not guilty, and that he finally agreed that he would plead guilty. On the morning he plead guilty, his attorney, Fred O. Parrish, came to see him and talked with him about his case and asked him what he wanted to do, and he told him that he wanted to plead not guilty, and Parrish told him not to talk to anyone unless he was present. The chief of police then came to him and tried to find out what he was going to do, and he told the chief that he didn't know Parrish and didn't know what he would do but guessed that he would plead guilty. Officer Nevius and the State's attorney then came to him, and he put them off, saying he didn't know what he would do. City attorney Ryan, and another whom he refers to as the "old fellow," next came and talked to him about his attorney. Ryan told him his attorney was a Ku Kluxer and liable to get him hanged, and said to him, "You know how much use a Ku Kluxer has for a nigger." The old fellow told him that Parrish didn't know anything about law, and Ryan told him that Parrish had defended a man for chicken stealing, the penalty for which was six months in jail, but Parrish got his client in the penitentiary and he was still in the penitentiary. Up to that time he had determined to have Parrish defend him but that what they told him about Parrish frightened him, and he then told them that he didn't want a lawyer and that he was going

to plead guilty, as they told him he would not be imprisoned over twenty years if he plead guilty,

Attorney Parrish corroborated the defendant as to the fact that he was employed on the evening of March 24, 1926, to defend the defendant, and that about nine o'clock the next morning he applied to the chief of police for an interview with the defendant, which was granted, and that he interviewed the defendant about fifteen minutes and asked him what he wanted to do, and the defendant told him that he wanted to plead not guilty, and that he did not kill Graves but that Mamie Young fired the shots which killed him. He then asked the defendant if he had confessed to the officers and the State's attorney that he killed Graves, and the defendant told him that he had made such confession but that it was not true. He then told the defendant he would see him later, and that he did see him on that afternoon in the court room, at which time he was arraigned and plead guilty, and that the defendant told him he wanted to plead guilty and did not want to make any defense and did not want a lawyer. Parrish further stated that he heard the court advise the defendant as to his rights and the effect of his plea of guilty and ask him if he did not want counsel, and the defendant told the court he did not want a lawyer and persisted in his plea of guilty. Parrish did not state that he informed the court he had been employed as the defendant's counsel, and the record does not show that the court at that time had any information that Parrish was so employed to represent the defendant.

Bruce Collins made two affidavits that were read in support of defendant's motion, one on March 28, 1926, which was sworn to before a notary public in Warren county, and the other was made and sworn to on March 30, 1926, before a notary public in Des Moines county, Iowa. In both of these affidavits the defendant is corroborated in the statement that Mamie Young, and not the defendant, fired the shot that killed Graves. He admits in his second

affidavit that he was convicted in the State of Texas for stealing a pair of roller skates out of the window of a building in the daytime when he was fifteen years of age and was sentenced from two to five years to the training school for boys at Gatesville, Texas, in March, 1915. He further states that he had known Mamie Young since about July, 1925, and had been paying her some attention and had taken her for a ride in an automobile at different times since that time, and that he knew the defendant and had worked with him in the same department in a cafe for about nine months before he was arrested. He also confirms the defendant in his statement that he and Mamie Young and the defendant were at Graves' place for about an hour on March 15 and drank whiskey, which he refers to as "hootch." He does not explain or state how Mamie came to be in the possession of the defendant's revolver, but states that up to the time she began firing at Graves he had heard nothing said by either her or Graves that indicated there was any ill-will or bad feeling of any kind on the part of either of them.

There were a number of other affidavits filed in support of the defendant's motion by his father and mother and a number of his friends living in Iowa, which affidavits we do not consider as having a great deal of bearing upon the merits of the motion. Most all of them were to the effect that the defendant was a minor and about the age of sixteen or eighteen years, was a steady and reliable colored boy who associated with the best class of colored people, was a good and reliable worker in his employment, had a good reputation generally, and had never committed or been charged with the commission of any crime up to the time of his arrest in this case. All these matters were considered by the court in passing on the defendant's guilt, including the fact that he was intoxicated when he committed the crime, and all other facts testified to by Mamie Young, as well as facts stated to the court by the State's

attorney and the defendant's counsel who represented him on his plea of guilty, which latter facts were matters in mitigation.

Errors of fact which may be availed of on writ of error *coram nobis* or under a motion made in pursuance of section 89 of our Practice act include duress, fraud and excusable mistake. Fraud on the part of the opposing party or his counsel that prevents one from making his defense is such an error of fact as can be availed of on writ of error *coram nobis* or under the statute aforesaid. (*Chapman v. North American Life Ins. Co.* 292 Ill. 179; *Tosetti Brewing Co.* v. *Koehler,* 200 id. 369.) The writ of error *coram nobis,* or a motion under said statute, is an appropriate remedy in criminal cases as well as in civil cases. Such a writ lies to set aside a conviction obtained by duress or fraud, or where by some excusable mistake or ignorance of the accused, and without negligence on his part, he has been deprived of a defense which he could have used at his trial and which if known to the court would have prevented a conviction, or to set aside a conviction based on a plea forced by fear of mob law or by other fear of the defendant induced by misconduct of the officers of the court or by other officers of the law in whose custody a confession was obtained by such unlawful means. 2 R. C. L. 305; 16 Corpus Juris, 1326, 1327; *Sanders* v. *State,* 44 Am. Rep. (Ind.) 29; *State* v. *Calhoun,* 18 L. R. A. (Kan.) 838, and note; *Trattner* v. *State,* 113 N. E. (Ind.) 243; *People* v. *Perez,* 98 Pac. (Cal.) 870; *Fugate* v. *State,* 37 So. (Miss.) 554.

The sufficiency of the motion, which is regarded as a declaration in a writ of error *coram nobis,* or a motion under the statute, must be raised by demurrer, plea of *nullo est erratum,* by motion to dismiss, by pleading special matter in confession and avoidance, or by making an issue of fact by traversing the declaration. (*State* v. *Calhoun, supra; Tyler* v. *Morris,* 34 Am. Dec. (N. C.) 395, and

note in 46 Am. Dec. 261; *Harris* v. *Chicago House Wrecking Co.* 314 Ill. 500.) In this State the issue of fact may be made, and is generally made, by affidavits in support of the motion and by counter-affidavits denying the facts set up in the motion and affidavits in support thereof, in which case the burden of proof is upon the party making the motion to prove his facts alleged by a preponderance of the evidence. (*Domitski* v. *American Linseed Co.* 221 Ill. 161; *Peak* v. *Shasted,* 21 id. 137; *Consolidated Coal Co.* v. *Oeltjen,* 189 id. 85.) The denial of the People in a criminal case is in the nature of a plea traversing the allegations of the motion or declaration of the accused. The proceedings in a criminal case are civil in their nature, and the burden is upon the accused to prove his allegations by a preponderance of the evidence. (2 R. C. L. 307.)

It is clear that the motion of the defendant, and the affidavits in support thereof, when considered alone, show good ground for setting aside the judgment in this case and for allowing the defendant to withdraw his plea of guilty and to interpose a plea of not guilty. When such a motion is filed and affidavits are submitted in support thereof the court has jurisdiction to hear the matter either in term time and after the defendant has been imprisoned and is serving his sentence, or in vacation after the term has been adjourned, and the court has the power, upon a proper writ issued, to have the defendant brought into court for such hearing if the same should be necessary. The real question, therefore, to be determined in this suit is whether or not the defendant has by the greater weight of the evidence proved that there were such errors of fact committed in the trial of the case as he has set up in his motion and in his affidavits in support thereof.

The counter-affidavits filed by the People were made and read to the court for the sole purpose of showing that the defendant's confession and plea of guilty were made by him freely and voluntarily and of his own free will and accord

and without fear or influence of any character induced by improper or unlawful conduct of the State's attorney or those who had the defendant in custody or gained access to him previous to his indictment and plea of guilty. By the counter-affidavits of the State's attorney, Henry D. Lewis, A. D. Irey, the city marshal or chief of police of the city of Monmouth, John J. Ryan, who assisted the police officials in their investigation of the murder of Graves, and John H. Hanley, a member of the bar of Warren county, it is shown that the defendant first made his confession to the State's attorney on the afternoon or evening of March 17, after he was arrested and brought to Monmouth, and that it was made voluntarily by him and without promises or persuasion or threats of any kind, and that he not only told the State's attorney that he killed Graves but explained in detail how he did it; that the State's attorney on that night informed the other affiants for the People above named of such confession and requested the officers to bring the defendant before the State's attorney and the affiants on that same night, which was done, and that the defendant again in their presence repeated his confession that he had made to the State's attorney and told all of them there that he killed Graves and described particularly the manner in which he did it, and that his confession there made was made freely and voluntarily and without hesitation, and that no promises of any kind or threats were made to him to induce him to confess, and that he there stated that he previously had made his confession to the State's attorney freely and voluntarily, without promises or threats of any kind.

By the affidavits of A. D. Irey and John J. Ryan, and of sheriff Murray, commissioner of public safety Donlan, and deputy city marshal Pierce, all three of Burlington, Iowa, it is shown that on Thursday afternoon of March 18, 1926, these Iowa officers visited Monmouth and asked for permission to see the defendant, which request was granted;

that about the middle of that afternoon they visited the defendant a short time, and while they were with him he wanted to talk to Irey and the State's attorney; that the State's attorney was not about the building and Irey and Ryan went to see what the defendant wanted; that then and there, in the presence of Murray, Donlan, Pierce, Ryan and Irey, the defendant repeated the confession which he had made to the State's attorney the night before and seemed anxious to discuss the facts and details of the killing; that he there again confessed that he killed Graves on March 15, and that the confession was made freely and voluntarily, without any threats or compulsion or promises on the part of anyone.

Lawrence Taylor and Ray Nevius, police officers of Monmouth, made affidavits for the People, in which they make specific denial of the charge of the defendant that they or any of the police officers threatened or mistreated him in any way during the time he was making his statements and confessions. Hanley and Ryan also specifically denied in their affidavits that they, or either of them, told the defendant that Parrish, the defendant's lawyer, was a Ku Kluxer and liable to get him hanged, and that Ryan did not say to the defendant, "You know how much use a Ku Kluxer has for a nigger;" and they further stated that they did not make any statements to him that would influence him to plead guilty or make any remarks to him of a disrespectful nature concerning his color.

Bruce Collins, who made the two affidavits for the defendant, made the specific statement for the People on March 19, 1926, in the presence of W. H. Schwenker, Ernest Bradshaw and Andrew Bender, that he heard the shots fired when Graves was killed but did not know who fired them; that when the firing began he broke out a window and got out of the house as quickly as he could and ran to his automobile; that the defendant came out to the car while he was trying to start it and that they then

drove to Burlington; that while they were on their way to Burlington the defendant asked him to help him get out of the trouble, and told him if anything came up he should swear that he didn't know whose gun it was that killed Graves, and that the defendant threw his gun out of the car as they were driving to Burlington. He further stated that the last time he saw the gun before the killing it was in the possession of the defendant, and that the first time he saw the gun after the shooting it was in the possession of the defendant. Collins also made an affidavit for the People on April 1, 1926, before a notary public of Des Moines, Iowa, in which he swore that his statement made on March 19, 1926, was true, and that he signed and swore to his previous affidavit made for the defendant without knowing the contents thereof or without having the same read to him.

In conclusion we will add that every statement of the defendant to the effect that his confession was unduly or unlawfully obtained by misconduct of any of the officers or by any promises of reward, or that he was induced to plead guilty by any unfair means or by any misunderstanding on his part as to his rights under the law, is contradicted by the witnesses as heretofore stated, and also by the further affidavit of the court stenographer, Mabel Weegar, who made stenographic notes of the confession made by the defendant in the presence of her and others. Collins' affidavit which he made for the defendant was subsequently repudiated by him in the affidavit which he made for the People. The court was therefore warranted by the evidence submitted by affidavits and counter-affidavits in finding that the defendant had failed to prove the errors of fact alleged by him by a preponderance of the evidence and did not err in refusing to sustain the defendant's motion aforesaid.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*